290 P.3d 525

Dana Naone HALL, Plaintiff–Appellant,

v.

DEPARTMENT OF LAND AND NATURAL RESOURCES, Board of Land and Natural Resources, William J. Aila, Jr. in his official capacity as chairperson of the Board of Land and Natural Resources and as the State Historic Preservation Officer, Puaalaokalani Aiu in her official capacity as administrator of the State Historic Preservation Division, Department of Health, Loretta J. Fuddy in her official capacity as the director of the Department of Health, Alvin T. Onaka in his official capacity as State Registrar of Vital Statistics and Chief of the Department of Health's Office of Health Status Monitoring, Kawaiaha'O Church, William Haole in his official capacity as the Chair of the Board of Trustees and Chair of the Board of Directors of Kawaiaha'o Church, John Does 1–10, Jane Does 1–10, and Doe Partnerships, Corporations, Trusts, Governmental Units or Other Entities 3–20, Defendants–Appellees.

No. CAAP–12–0000061.

Intermediate Court of Appeals of Hawai'i.

Dec. 14, 2012.

David Kimo Frankel, David Kauila Kopper (Native Hawaiian Legal Corporation), Isaac D. Hall, on the brief, for Plaintiff–Appellant.

Marie Manuele Gavigan, Deputy Attorney General, on the brief, for Defendants–Appellees Department of Land and Natural Resources, Board of Land and Natural Resources, William J. Aila, Jr. and Puaalaokalani Aiu, in their respective official capacities, Department of Health, Loretta J. Fuddy and Alvin T. Onaka in their respective official capacities.

James Kawashima, Michael A. Lorusso, Tracie M. Kobayashi (Kawashima Lorusso LLP), on the brief, for Defendants–Appellees Kawaiaha‘O Church and William Haole in his official capacity.

NAKAMURA, Chief Judge, and LEONARD and REIFURTH, JJ.

Opinion of the Court by NAKAMURA, C.J.

## INTRODUCTION

### I.

Plaintiff–Appellant Dana Naone Hall (Hall) has family members who are buried on the grounds of Kawaiaha‘o Church. She is concerned that family members may be in unmarked burials on Kawaiaha‘o Church grounds and does not want the unmarked burials of family members or other burial remains to be disturbed or altered. Hall is a native Hawaiian who is recognized by the O‘ahu Island Burial Council (OIBC) as a

cultural descendant of the native Hawaiian burial remains, or iwi, found on the Kawaiaha'o Church grounds. Hall has a traditional and customary practice of protecting iwi.

Kawaiaha'o Church was founded in about 1820 by the first missionaries to arrive in Hawai'i and is a congregational church devoted to the Christian faith. At issue in this case is Kawaiaha'o Church's project to construct a new Multi–Purpose Center (MPC) to replace its social hall, known as Likeke Hall, and an adjacent office building (MPC Project).

Hall filed suit against the Department of Land and Natural Resources (DLNR), the Board of Land and Natural Resources (BLNR), the Department of Health (DOH), and various State of Hawai'i (State) officials, in their official capacities (collectively, the "State Defendants"),[1] and Kawaiaha'o Church and the Chair of the Board of Trustees and Board of Directors of Kawaiaha'o Church, in his official capacity (collectively, "Kawaiaha'o Church").[2] Hall raised, various claims and sought declaratory and injunctive relief. Central to Hall's complaint is her claim that the State's allowing construction activity to proceed on the MPC Project without requiring an archeological inventory survey (AIS) violated Hawai'i's historic preservation law, Hawaii Revised Statutes (HRS) Chapter 6E, and its implementing rules. Hall alleged that an AIS was required; that the failure of the DLNR, through its State Historic Preservation Division (SHPD), to require an AIS has resulted in the failure to protect burials and burial sites from improper alteration; and that Kawaiaha'o Church should be enjoined from proceeding with the MPC Project until an adequate AIS is prepared.

On November 12, 2010, Hall moved for a preliminary injunction, which was denied by the Circuit Court of the First Circuit (Circuit Court). On December 2, 2011, all parties filed motions for summary judgment. At a hearing on the motions, the Circuit Court orally denied Hall's motion for summary judgment and granted the motions for summary judgment filed by Kawaiaha'o Church and the State Defendants.[3] On January 24, 2012, the Circuit Court filed written orders memorializing its summary judgment decisions. The Circuit Court entered its final judgment on January 31, 2012.

## II.

On appeal, Hall argues that the Circuit Court erred in denying her motion for summary judgement and in granting Defendants' motions for summary judgment.[4]

The Hawai'i Supreme Court's recent decision in *Kaleikini v. Yoshioka*, 128 Hawai'i 53, 283 P.3d 60 (2012), provides the framework for our analysis. In *Kaleikini*, the supreme court held that the rules applicable to Hawai'i's historic preservation law establish a sequential review process, under which the completion of an AIS, if required, must precede the SHPD's concurrence in a project. *Id.* at 68, 283 P.3d at 75. HRS § 6E–42 (2009) requires a review and comment process for "any project involving a permit, license, certificate, land use change, subdivision, or other entitlement for use, which *may* affect historic property ... or a burial site[.]" (Emphasis added.) The details of this process are governed by Hawai'i Administrative Rules (HAR) Chapter 13–284. Under this regulatory regime, prior to State government approval of any project involving a permit, the SHPD must be consulted "to determine if

1. The State officials sued in their official capacities are the Chairperson of the BLNR and State Historic Preservation Officer, the Administrator of the State Historic Preservation Division (SHPD), the Director of the DOH, and the State Registrar of Vital Statistics and Chief of the DOH's Office of Health Status Monitoring.

2. Hall's lawsuit named Frank Pestana (Pestana), in his official capacity as the Chair of the Board of Trustees and Chair of the Board of Directors of Kawaiaha'o Church, as a defendant. On October 25, 2012, this court granted Kawaiaha'o

Church's motion to substitute William Haole, in his official capacity as the Chair of the Board of Trustees and Chair of the Board of Directors of Kawaiaha'o Church, as a party for Pestana in this appeal.

3. We will collectively refer to Kawaiaha'o Church and the State Defendants as the "Defendants."

4. The Honorable Karl K. Sakamoto presided over the proceedings relevant to this appeal.

the area proposed for the project needs to undergo an inventory survey to determine if historic properties are present." HAR § 13–284–5(b) (2003).

As the supreme court stated in *Kaleikini*, the SHPD may respond in one of three ways:

> (1) by determining that no historic properties are present; (2) by determining that an adequate survey exists and that historic properties are present, which allows the agency to proceed to the next step in the review process, i.e., evaluation of the significance of the historic properties; or (3) by concluding that an [AIS] needs to be done....

*Kaleikini*, 128 Hawai'i at 74, 283 P.3d at 81 (discussing nearly identical rule in HAR § 13–275–5(b)) (internal quotation marks and brackets omitted). The SHPD did not make either of the first two determinations in this case. Therefore, the completion of an AIS was a necessary first step. Based on *Kaleikini*, we conclude that the SHPD should have required Kawaiaha'o Church to complete an AIS before concurring in the MPC Project and that the SHPD violated its own rules in failing to require an AIS before permitting the project to go forward.[5]

As explained in greater detail below, we conclude that the MPC Project was subject to the requirements of HRS § 6E–42 and its implementing rules, and that the Circuit Court erred in granting summary judgment in favor of Defendants on Hall's HRS Chapter 6E claims. We vacate the Circuit Court's final judgment with respect to Hall's HRS Chapter 6E claims (Counts 1, 2, 4, 5, 6, and 11) and remand for further proceedings. Certain of Hall's remaining non-HRS Chapter 6E claims, and the Circuit Court's analysis in dismissing them, are based on the assumption that HRS § 6E–42 would not be applied to the MPC Project. As to these claims, our decision that HRS § 6E–42 is applicable to the MPC Project significantly alters the posture of this case, changes the context in which these claims are made, and undermines the Circuit Court's analysis. We vacate the Circuit Court's final judgment with respect to such claims (Count 3 and Count 8 as against Kawaiaha'o Church) and remand for reconsideration by the Circuit Court based on our analysis and on further developments in the case. With respect to Hall's other non-HRS Chapter 6E claims, we conclude that the Circuit Court erred in granting summary judgment in favor of Defendants on Count 7 and vacate the final judgment as to Count 7. We affirm the Circuit Court's grant of summary judgment and its final judgment in favor of the State Defendants on Count 8 and in favor of the State Defendants and Kawaiaha'o Church on Counts 9 and 10.

## BACKGROUND

### I.

In about 2002, Kawaiaha'o Church began planning the MPC Project to replace Likeke Hall and an adjacent office building. The office building had been constructed in 1929 and Likeke Hall in 1940. Likeke Hall was constructed over burial lots on the Kawaiaha'o Church grounds. During the construction of Likeke Hall in 1940, 117 sets of human remains were disinterred from the area where Likeke Hall was built. The MPC Project also included the digging of trenches to install sewer, water, and electrical utility lines.

The original plans for the MPC Project included a footprint that was significantly larger than the footprint of Likeke Hall and the office building and contemplated a underground parking structure and a courtyard. In its initial evaluation of the MPC Project, the SHPD acknowledged the potential that human burials would be disturbed and the necessity for an AIS to be conducted prior to

---

5. The Hawai'i Supreme Court issued its decision in *Kaleikini* on August 24, 2012. On September 5, 2012, Hall filed a second motion for injunctive relief pending appeal. On September 27, 2012, the supreme court denied a motion asking it to reconsider its decision in *Kaleikini*. On September 28, 2012, this court granted Hall's motion for injunctive relief and enjoined Kawaiaha'o Church, pending this appeal, from the disinterment of human skeletal remains or iwi from Kawaiaha'o Church grounds that are related to the MPC Project and from all construction activities related to the MPC Project that could result in the disinterment of human skeletal remains or iwi.

any ground disturbance. On February 10, 2004, the SHPD informed the Hawai'i Community Development Authority (HCDA):

> Historic documentation suggests that significant subsurface historic deposits including human burials were once located in this area. Because of the potential for subsurface historic sites to exist, we believe than [sic] an archaeological inventory survey with a program of subsurface testing, be conducted of the areas proposed for ground disturbance in order to determine if historic sites are present, and if so, to gather sufficient information to evaluate their significance. The archaeological inventory survey must be conducted prior to beginning any ground disturbance and a report of the findings should be submitted to the State Historic Preservation Division for review and approval.

Accordingly, the HCDA issued a Project Eligibility Permit to Kawaiaha'o Church on February 24, 2004, which was conditioned on the completion of an AIS. On May 4, 2005, the HCDA issued a Development Permit and Certificate of Appropriateness which stated that the SHPD was "requiring [Kawaiaha'o Church] to conduct an archaeological inventory survey with a program of subsurface testing to determine if historic sites are present." The Development Permit was conditioned on "[c]ompliance with the conditions set forth in the Project Eligibility Permit[.]"

Kawaiaha'o Church eventually decided to scale-back its plans for the MPC Project. Under the scaled-back plans, the footprint of the MPC Project would be similar to, but approximately 10 percent larger than, the footprint of Likeke Hall and the office building.

As part of Kawaiaha'o Church's planing process, it retained Ku'iwalu as a native Hawaiian cultural consultant in late 2005. Ku'iwalu was involved in Kawaiaha'o Church's outreach efforts, which included attempts to contact families associated with old burial plots that may be directly impacted by the MPC Project and publishing notices in newspapers and publications. Kawaiaha'o Church invited such families and other interested people to public meetings to gather input and provide information about the MPC Project.

Kawaiaha'o Church's consultant advised Kawaiaha'o Church that preparation of an AIS would be costly and take considerable time. In particular, the consultant advised that any human remains found during an AIS would be considered "previously identified," a designation that would require publication of notices and consultation with lineal and cultural descendants, involve the OIBC, and could preclude the relocation of human remains and require their preservation in place.

After the plans were revised to reduce the footprint of the MPC Project and eliminate the underground parking structure, Kawaiaha'o Church decided to approach the SHPD to see whether an AIS was still required. In January of 2006, a Kawaiaha'o Church representative met with the Administrator of the SHPD to discuss the revised plans and whether an AIS would still be required. After this meeting, Kawaiaha'o Church understood that the SHPD would consider allowing the MPC Project to go forward under a archaeological monitoring plan (AMP), instead of requiring an AIS.

In August 2006, Kawaiaha'o Church submitted its AMP to the SHPD for its approval. The AMP noted that the footprint of the new MPC building would be similar to the footprint of the existing Likeke Hall, which was "good in that we know that 117 burials were disinterred in 1940 from this area." Nevertheless, the AMP stated: "It would seem likely however that some human remains would still lie under the footprint of the proposed construction." The AMP further stated: "The project area has the potential for historic cultural deposits relating to the early history of Kawaiaha'o Church as well as both pre-contact and historic human burials.... Historic properties may be encountered anywhere within the project area."

The SHPD accepted the AMP. In a letter to Kawaiaha'o Church dated December 27, 2006, the SHPD stated:

> We previously commented on this proposed undertaking. In a letter dated September 28, 2006 ..., we accepted an archaeological monitoring plan by Cultural

Surveys Hawai'i, Inc.... as fulfilling the requirements of Hawai'i Administrative Rules (HAR) Chapter 13–279. The monitoring plan calls for on-site (100%) monitoring of all ground disturbing activities associated with demolition and construction on the Kawaiaha'o Church grounds. Therefore, provided that the proposed undertaking is implemented as stated in the aforementioned monitoring plan, we believe that the proposed undertaking will have "no adverse effect" on historically-significant resources.

## II.

In late 2007, construction work on the MPC Project began with the demolition of Likeke Hall and the office building. In January 2009, Kawaiaha'o Church began excavation work for the MPC Project, which involved areas within the footprint of the old Likeke Hall as well as areas outside this footprint to install utility lines. During excavation for the utility lines, burials were discovered. The SHPD assumed jurisdiction and approved the disinterment of the burials. As the excavation continued, more burials were discovered in the utility line trenches and under the old Likeke Hall, until the number of sets of human remains uncovered grew to 69. A number of the burials were determined to be native Hawaiian.

In about April 2009, Kawaiaha'o Church stopped work on the MPC Project. Kawaiaha'o Church asserts that at that time, "it was approximately ninety-five percent (95%) done with the excavation work for the new sewer line and approximately ninety percent (90%) done with the excavation for the footings for the first and second floor of the MPC Building." Construction activities on the MPC Project remained halted until about May 2011.

After the construction stopped and the SHPD had approved the disinterment of the 69 sets of human remains that had been discovered, the State reevaluated the question of agency jurisdiction over the MPC Project. The State determined that the SHPD and the DOH would exercise joint jurisdiction over the burials uncovered during the MPC Project.

In a letter to Kawaiaha'o Church dated June 11, 2009, the Chairperson of the DLNR explained that because the State viewed the MPC Project as involving a cemetery, the involvement of both the DOH and the DLNR was required under HRS § 6E–41 to remove or redesignate the cemetery for the MPC Project to move forward. The DOH would be responsible for issuing a disinterment permit and the DLNR would be responsible for coordinating conditions for the disinterment of unidentified burials. The letter advised that once all burials were removed from the project area, the boundaries of the cemetery should be readjusted to remove the project area from the cemetery designation, so that no new interments will be allowed in the project area. The letter outlined the conditions that Kawaiaha'o Church was required to follow regarding the removal of burials in order to continue with the MPC Project.

Thus, based on the June 11, 2009, letter, it was determined that the DLNR and the DOH would exercise joint jurisdiction with respect to the MPC Project pursuant to HRS § 6E–41, that Kawaiahao Church would obtain a disinterment permit from the DOH, and the MPC Project could continue based on conditions imposed by the State. On October 22, 2010, the DOH issued a blanket disinterment permit to Kawaiaha'o Church.

## III.

### A.

In the meantime, on August 6, 2009, Hall filed a complaint in the Circuit Court against Defendants seeking declaratory and injunctive relief. On April 6, 2010, Hall filed a first amended complaint. On November 12, 2010, after the DOH issued the blanket disinterment permit, Hall filed a motion for preliminary injunction to enjoin continued excavation by Kawaiaha'o Church. Hall argued, among other things, that the MPC Project should be halted because the required AIS had not been prepared. The Circuit Court denied Hall's motion, and it approved as to form Defendants' proposed findings of fact, conclusions of law, and order regarding

Hall's motion for preliminary injunction, which was filed on October 11, 2011.

On December 1, 2010, Hall filed a second amended complaint, which alleged:

Count 1: The failure to require an AIS violates HAR Chapter 13–284.

Count 2: The MPC Project site is not a known, maintained, actively used cemetery within the meaning of HRS § 6E–43 and therefore burials affected by the project cannot be disinterred and relocated through a DOH disinterment permit.

Count 3: The use of a blanket disinterment permit under HRS § 338–25.5, without any rules for such permit that would protect historic native Hawaiian burials, to disinter and relocate burials violates Hall's due process rights.

Count 4: The use of HRS § 6E–41, without applying rules to protect historic native Hawaiian burials, to disinter and relocate burials violates Hall's due process rights.

Count 5: The burials related to the MPC Project require O'ahu Island Burial Council (OIBC) determination before action can be taken.

Count 6: Defendants violated HRS § 6E–43 and HAR Chapter 13–300.

Count 7: The failure to perform an environmental assessment violates HRS Chapter 343.

Count 8: Defendants have failed to obtain permits required for the MPC Project.

Count 9: Defendants failed to fulfill the obligations imposed on them by the public trust doctrine.

Count 10: Defendants have failed to investigate and protect native Hawaiian rights.

Count 11: An AIS necessary for the MPC Project has not been prepared.

Hall prayed for declaratory and injunctive relief, including that the Circuit Court:

1. Declare that Defendants have failed to require the preparation of an AIS and require the preparation and approval of an AIS

before any further construction activities on Kawaiaha'o Church property take place;

2. Declare that the MPC Project site is not a known, maintained, actively used cemetery; that the State's burial law is applicable to historic native Hawaiian burials located on the property; and that the burials may not be disinterred and relocated pursuant to a DOH disinterment permit;

3. Declare that the burials within the area of the MPC Project are "previously identified" burials and are within the jurisdiction of the OIBC.

4. Enjoin the State Defendants from rendering any further decisions regarding the disinterment or relocation of burials until an AIS is prepared and approved and the OIBC renders a decision regarding previously identified burials on the Kawaiaha'o Church grounds; and

5. Enjoin Kawaiaha'o Church from disinterring any remains on the Kawaiaha'o Church property and commencing any work on the MPC Project until all approvals are properly authorized.

**B.**

On October 10, 2011, Hall filed a motion to amend her second amended complaint, seeking, among other things, to add a count to allege, in the alternative, that if the area of the proposed MPC Project is a cemetery, then HRS Chapter 441 requires that it be used exclusively for cemetery purposes until the dedication is removed, and thus construction cannot begin until then. On November 8, 2011, the Circuit Court denied Hall's motion to amend the second amended complaint. On November 16, 2011, Paulette Ka'anohiokalani Kaleikini (Kaleikini), a native Hawaiian who was also represented by Hall's counsel, filed a separate civil action, *Kaleikini v. Kawaiaha'o Church, et. al.,* Civil No. 11–1–2816–11 ECN ("Kaleikini Lawsuit").[6] The Kaleikini Lawsuit concerned the MPC Project and was filed against the same defendants as in Hall's case. A different Circuit

6. We use the term "Kaleikini Lawsuit" to distinguish it from the *Kaleikini* decision recently issued by the Hawai'i Supreme Court in *Kaleikini*

*v. Yoshioka.* The same plaintiff, Paulette Ka'anohiokalani Kaleikini, was involved in both cases.

Court Judge, the Honorable Edwin C. Nacino, presided over the Kaleikini Lawsuit.

The complaint in the Kaleikini Lawsuit alleged that the issue of the appropriateness of disinterment is the subject of Hall's case; that Kaleikini's complaint was narrowly focused on preventing the construction of a building on top of burials that are known, or highly likely, to exist; that Kawaiahaʻo Church claims that the MPC Project site is a dedicated cemetery; and that HRS Chapter 441 requires that cemeteries be used exclusively for cemetery purposes. In moving for a preliminary injunction to enjoin construction of the MPC building, Kaleikini stipulated with Defendants that the MPC Project site was a dedicated cemetery pursuant to HRS Chapter 441. Based on this stipulation, a stipulation that burials are presently located at the proposed MPC Project site, and a finding that the majority of the area under the MPC Project site has not yet been excavated, the Circuit Court (Judge Nacino) enjoined Defendants from engaging in any construction activity on the MPC Project site until the cemetery designation was properly removed. The order granting Kaleikini's motion for preliminary injunction was filed in the Kaleikini Lawsuit on December 2, 2011.

### C.

On that same day, Hall, Kawaiahaʻo Church, and the State Defendants each filed a motion for summary judgment with respect to Hall's second amended complaint. On January 13, 2012, a hearing was held on the parties' summary judgment motions. At the hearing, the Circuit Court (Judge Sakamoto) denied Hall's motion and granted Defendants' motions, and it provided an explanation for its ruling. The Circuit Court explained that its decision to grant summary judgment in favor of Defendants on the bulk of Hall's claims was based on: (1) its interpretation of the statutory framework of HRS Chapters 6E and 441; and (2) its application of the doctrine of judicial estoppel.

The Circuit Court concluded that HRS Chapters 441 and 6E were intended to cover "separate and distinct situations" and to protect human remains more than 50 years old based on the location at which they were found. The Circuit Court ruled that "each chapter is intended exclusively for different situations[:]" HRS Chapter 441 was intended to apply to human remains found in a cemetery and HRS Chapter 6E was intended to apply to human remains over 50 years old (and therefore "historic property") found in a location that is not a cemetery.[7]

The Circuit Court observed that shortly after Hall's request to amend her complaint to add a count for violation of HRS Chapter 441 had been denied, a separate complaint was filed in the Kaleikini Lawsuit; that Kaleikini was represented by the same counsel as Hall and had sued the same defendants as Hall over the same MPC Project; and that the Kaleikini Lawsuit contains a single count which alleges a violation of HRS Chapter 441. The Circuit Court took judicial notice of the Kaleikini Lawsuit and considered it to be "an outgrowth" of Hall's case. Based on its view that HRS Chapters 6E and 441 were mutually exclusive and could not both be applied to a single site containing human remains, the Circuit Court reasoned that it "cannot allow claims for both HRS [Chapters] 441 and 6E to go forward as applied to the same site." The Circuit Court ruled that because Hall's counsel had gone forward in the Kaleikini Lawsuit and secured a preliminary injunction based on HRS Chapter 441, Hall was precluded based on the principle of judicial estoppel from arguing "that the exact same MPC site is not a cemetery but a burial site." Applying its analysis that Hall could only claim that the MPC site was a cemetery and that HRS Chapter 6E did not apply to human remains found in cemeteries, the Circuit Court concluded that Hall's claims arising out of the application HRS Chapter 6E were "moot." On this basis, the Circuit Court granted summary judgment in favor of Defendants on Counts 1, 2, 4, 5, 6, and 11.

---

7. The Circuit Court opined that HRS § 338–25.5 provides "an extra layer of protection" to human remains, regardless of their age or location, by requiring a DOH permit before they can be disturbed, but noted that the DLNR can waive the DOH permit requirement in the case of an HRS Chapter 6E disinterment pursuant to HRS §§ 6E–43 and 6E–43.6.

The Circuit Court also granted summary judgment in favor of Defendants on Hall's claims in Counts 3, 7, 8, 9, and 10.[8]

## DISCUSSION

### I.

Hall's principal claim in this case is that an AIS, which would identify native Hawaiian burial sites and other historic property in the area of the MPC Project, was required and that State violated HRS Chapter 6E and its implementing rules by allowing ground-disturbing construction activity on the MPC Project without first requiring the completion of an AIS. Native Hawaiian burials discovered during the AIS process are considered "previously identified" and therefore subject to the jurisdiction of the island burial councils. *See* HAR § 13–300–31(b) (1996). Under HRS § 6E–43(b) (2009), "[t]he appropriate island burial council shall determine whether preservation in place or relocation of previously identified native Hawaiian burial sites is warranted...." [9]

In *Kaleikini v. Yoshioka*, 128 Hawai'i 53, 283 P.3d 60, the Hawai'i Supreme Court recently analyzed the requirements for the preparation of an AIS to protect historic burial sites under HRS Chapter 6E and its implementing rules. We conclude that *Kaleikini* establishes an analytical framework that controls our decision in this case. Based on *Kaleikini*, we conclude that the SHPD violated its own rules by failing to require the preparation of an AIS before permitting the MPC Project to go forward.

### II.

Because we view *Kaleikini* as controlling, we start with a discussion of that case. Ka-

leikini, a native Hawaiian who engaged in the traditional and customary practice of protecting native Hawaiian burial remains, sued the City and County of Honolulu (City) and the State, challenging the approval of the Honolulu High–Capacity Transit Corridor Project (rail project). *Id.* at 56, 283 P.3d at 63. The rail project involved the construction of a 20–mile fixed guideway rail system in four phases. *Id.* It was undisputed that the rail project had a high likelihood of having a potential effect on archeological resources, particularly native Hawaiian burial sites, in its last phase, which included the Kaka'ako area. *Id.* at 58, 63, 283 P.3d at 65, 70. Kawaiaha'o Church is located in this area.

Kaleikini argued that the rail project should be enjoined until an AIS, which would identify and document archaeological historic properties and burial sites in the project area, was completed for all four phases of the rail project. *Id.* at 56, 283 P.3d at 63. She further argued that the "failure to complete an [AIS] prior to the start of construction jeopardized the integrity of native Hawaiian burial sites by foreclosing options such as not building the rail, changing its route, or using a [less intrusive] technology[.]" *Id.* The City asserted that it had a plan to complete an AIS for each phase of the project, which was set forth in a Programmatic Agreement, and that HRS Chapter 6E was satisfied as long as an AIS was completed for a particular phase before construction on that phase began. *Id.* at 56–57, 283 P.3d at 63–64. Pursuant to the Programmatic Agreement and the City's interpretation of HRS Chapter 6E, the City had started construction on Phase 1 of the rail project, for which an AIS had been

---

8. *See* discussion *infra* regarding these counts.

9. A committee report on the bill establishing the island burial councils explained that the bill was "in response to the need for sensitive treatment of Hawaiian burial sites through cooperative and shared decisionmaking with representatives of the Hawaiian community." Stand. Comm. Rep. 379–90, 1990 House Journal at 987. In Act 306, the 1990 legislation that established the island burial councils, the Legislature stated:

The purpose of this Act is to augment current procedures relating to the proper care and

protection of burial sites found in the State. In order to avoid future disputes arising from the discovery of human skeletal remains, this Act provides additional protection for native Hawaiian burial sites of high preservation value such as areas with a concentration of skeletal remains, or prehistoric or historic burials associated with important individuals or events, that are within a context of historic properties, or have known lineal descendants. 1990 Haw. Sess. Laws Act 306, § 1 at 956.

completed, before an AIS for all phases had been completed.

The supreme court held that "the SHPD failed to follow its own rules when it concurred in the rail project prior to the completion of an archaeological inventory survey for the entire project." *Id.* at 57, 283 P.3d at 64. The court interpreted the rules promulgated by the DLNR to implement HRS Chapter 6E as establishing "a sequential process under which an AIS, if required, must precede the SHPD's concurrence in a project." *Id.* at 68, 283 P.3d at 75. The court emphasized that according to the rules, " 'the review process is designed to identify significant historic properties in project areas *and then* to develop and execute plans to handle impacts to the significant properties in the public interest.' " *Id.* at 57, 283 P.3d at 64 (emphasis in original; brackets and citation omitted).

The court concluded that the rules did not permit the SHPD to consider the rail project in four separate phases for the purposes of historic preservation review. *Id.* It also rejected the City and State's argument that the Programmatic Agreement constituted an "interim protection plan" that would allow the rail project to start before completion of the full historic review process. *Id.* The court ruled that "that an interim protection plan is a form of mitigation that, under the sequential approach of the rules, can be developed only after an AIS has been completed." *Id.* The court also held that Kaleikini had made a sufficient showing of irreparable injury to establish standing to sue under HRS § 6E–13 (2009).[10] *Id.* at 68–71, 283 P.3d at 75–78.

Because the rail project was a government construction project, Kaleikini argued that the failure to complete an AIS for the entire project violated the review and approval requirements under both HRS § 6E–8 (2009) and HRS § 6E–42 (2009).[11] *Id.* at 71, 283 P.3d at 78. The supreme court held that both the rules implementing HRS § 6E–8 and HRS § 6E–42 "clearly establish a sequential approach to the historic preservation review process[.]" *Id.* at 72, 283 P.3d at 79.[12] Under this sequential process, an AIS, when required, forms part of the first step of the process: to identify and inventory historic properties in the project area. *Id.* at 75, 283 P.3d at 82. Once an adequate AIS is submitted, then the next sequential steps in the process can take place: (1) if historic properties are present, the significance of each historic property is evaluated; (2) if significant

10. HRS § 6E–13(b) provides:

Any person may maintain an action in the trial court having jurisdiction where the alleged violation occurred or is likely to occur for restraining orders or injunctive relief against the State, its political subdivisions, or any person upon a showing of irreparable injury, for the protection of an historic property or a burial site and the public trust therein from unauthorized or improper demolition, alteration, or transfer of the property or burial site.

11. HRS §§ 6E–8 and 6E–42 provide, in pertinent part:

§ 6E–8 **Review of effect of proposed state projects.** (a) Before any agency or officer of the State or its political subdivisions commences any project which may affect historic property, aviation artifact, or a burial site, *the agency or officer shall advise the [DLNR] and allow the [DLNR] an opportunity for review of the effect of the proposed project on historic properties, aviation artifacts, or burial sites, consistent with section 6E–43,* especially those listed on the Hawaii register of historic places. The proposed project shall not be commenced, or in the event it has already begun, continued, until the [DLNR] shall have given its written concurrence.

§ 6E–42 **Review of proposed projects.** (a) Before any agency or officer of the State or its political subdivisions approves any project involving a permit, license, certificate, land use change, subdivision, or other entitlement for use, which may affect historic property, aviation artifacts, or a burial site, *the agency or office shall advise the [DLNR] and prior to any approval allow the [DLNR] an opportunity for review and comment on the effect of the proposed project on historic properties, aviation artifacts, or burial sites, consistent with section 6E–43,* including those listed in the Hawaii register of historic places.
(Emphases added).

12. Although the supreme court noted there were differences between HRS § 6E–8 and HRS § 6E–42, it stated that the implementing rules for both sections "provide for a very similar review and comment process[.]" *Kaleikini,* 128 Hawai'i at 73, 283 P.3d at 80. The court also stated that for purposes of its analysis in *Kaleikini,* the review steps under HAR Chapter 13–284 (the implementing rules for HRS § 6E–42) "are nearly identical to those contained in [HAR] chapter 13–275" (the implementing rules for HRS § 6E–8). *Id.* at 73 n. 27, 283 P.3d at 80 n. 27.

historic properties are present, the impact of the proposed project on such properties must be assessed; (3) if the project will affect significant historic properties, mitigation plans and commitments for each significant historic property must be developed and approved. *Id.* The supreme court held that because the SHPD failed to follow this sequential approach to the historic preservation review process, the SHPD improperly concurred in the rail project. *Id.* at 76, 283 P.3d at 83.

## III.

■ Defendants argue that Hall lacks a sufficient personal stake in the outcome of the litigation to establish standing to raise her HRS Chapter 6E claims. This argument is foreclosed by the supreme court's decision in *Kaleikini.* Kaleikini asserted that she is a recognized cultural descendent of the iwi found in Kaka'ako, that there is a high likelihood that the rail project will affect burials in that area; that the unnecessary removal of iwi causes her great pain and suffering; and "the City's decision to proceed with the rail project without first completing the required historic preservation review process forecloses options that would provide greater protection to burials[.]'" *Id.* at 68–69, 283 P.3d at 75–76. The supreme court also cited the views of the OIBC that "'intrusions into burials' are 'considered extremely offensive and disrespectful—an act of violence and degradation directed at the deceased individual, the living family members, and the larger community associated with the burial.'" *Id.* at 69, 283 P.3d at 76 (brackets omitted).

Based on the foregoing, the supreme court concluded that Kaleikini has made a sufficient showing of standing. *Id.* at 69–71, 283 P.3d at 76–78. It ruled that she had made a sufficient showing of irreparable injury in the form of threatened injury to the Kaka'ako burial sites to satisfy standing under HRS § 6E–13(b). *Id.* at 69–70, 283 P.3d at 76–77. It also ruled that she had shown a sufficient procedural injury, the denial of the opportunity to consult in an AIS prior to the rail

project's approval, to establish procedural standing. *Id.* at 71, 283 P.3d at 78.

Here, the showing made by Hall is comparable to the showing the supreme court found was sufficient for standing in *Kaleikini.* Hall asserts that she has family members who are buried on the grounds of Kawaiaha'o Church; she is a native Hawaiian and a recognized cultural descendant of the iwi found on the Kawaiaha'o Church grounds; she has a traditional and customary practice of caring for iwi; she is concerned that her family members may be in unmarked burials on Kawaiaha'o Church grounds; and the disturbance of unmarked burials of family members or other cultural ancestors would cause her injury and harm. Based on *Kaleikini,* we conclude that Hall has standing to raise her HRS Chapter 6E claims.

Defendants also argue that Hall lacks standing on her HRS Chapter 6E claims because the native Hawaiian burials uncovered during the MPC Project were "Christian burials,"[13] and thus could not be considered traditional native Hawaiian burials, and because HRS Chapter 6E does not protect burial sites in cemeteries. We disagree.

The protections provided by HRS Chapter 6E to human skeletal remains and burial sites do not turn on religious distinctions. In enacting amendments to HRS Chapter 6E, the Legislature stated:

All human skeletal remains and burial sites within the State of Hawaii are entitled to equal protection under the law regardless of race, religion, or cultural origin. The public has a vital interest in the proper disposition of the bodies of its deceased members, which is in the nature of a sacred trust for the benefit of all...."

1990 Haw. Sess. Laws Act 22, § 1 at 28; 1990 Haw. Sess. Laws Act 306, § 1 at 956. Hall's interest in protecting family members' unmarked burials and native Hawaiian burials is not extinguished by the burials being Christian burials. Moreover, as explained below, the MPC Project site affected burials that were covered by the protections provided to historic property by HRS Chapter 6E.

---

13. Kawaiaha'o Church's expert explained that the phrase "Christian burial" commonly refers to the a style of burial—"supine, extended, at a depth" and that "it would be odd to speculate categorically on the religious beliefs of sets of human skeletal remains."

## IV.

■ Defendants contend that the MPC Project was exempt from the historic preservation review process required by HRS § 6E–42 and its implementing rules because the project involved a cemetery. We disagree.

HRS § 6E–42 provides for a review and comment process for projects that may affect burial sites and other historic property. HRS § 6E–42 provides in pertinent part:

(a) Before any agency or officer of the State or its political subdivisions approves any project involving a permit, license, certificate, land use change, subdivision, or other entitlement for use, *which may affect historic property . . . or a burial site, the agency or office shall advise the [DLNR] and prior to any approval allow the [DLNR] an opportunity for review and comment on the effect of the proposed project on historic properties . . . or burial sites, consistent with section 6E–43,* including those listed in the Hawaii register of historic places.

(Emphasis added.)

HRS § 6E–2 (2009) defines the terms "burial site" and "historic property" as follows:

**14.** HRS § 6E–41 provides:

**Cemeteries; removal or redesignation.** (a) Any person removing or redesignating any cemetery shall comply with the following requirements:
(1) Publish a notice in a newspaper of general circulation in the State, requesting persons having information concerning the cemetery or persons buried in it to report that information to the [DLNR];
(2) Photograph the cemetery generally, and take separate photographs of all headstones located in the cemetery;
(3) Turn over to the [DLNR] all photographs and any other relevant historical records;
(4) Move all headstones to the place of reinterment; and
(5) Obtain the written concurrence of the [DLNR] prior to any removal or redesignation if the cemetery has existed for more than fifty years.
(b) The requirements of subsection (a) shall be in addition to any requirements imposed by the department of health.

**15.** HRS § 6E–43 provides in relevant part:

**Prehistoric and historic burial sites.** (a) At any site, other than a known, maintained, actively

"Burial site" means any specific unmarked location where prehistoric or historic human skeletal remains and their associated burial goods are interred, and its immediate surrounding archaeological context, deemed a unique class of historic property and not otherwise included in section 6E–41.

. . . .

"Historic property" means any building, structure, object, district, area, or site, including heiau and underwater site, which is over fifty years old.

HRS § 6E–41 (2009) [14] sets forth requirements for persons removing or redesignating a cemetery, and HRS § 6E–43 (2009) [15] establishes procedures applicable to the discovery of historic human skeletal remains and to burial sites.

Contrary to Defendants' contention, cemeteries are not exempt from the historic preservation review process required by HRS § 6E–42 and its implementing rules. Cemeteries are not expressly exempted by the language of HRS § 6E–42. Instead, HRS § 6E–42 applies to any project, requiring the specified government approvals, "which may

used cemetery where human skeletal remains are discovered or are known to be buried and appear to be over fifty years old, the remains and their associated burial goods shall not be moved without the [DLNR's] approval.
(b) All burial sites are significant and shall be preserved in place until compliance with this section is met, except as provided in section 6E–43.6 [ (relating to inadvertent discovery of burial sites) ]. The appropriate island burial council shall determine whether preservation in place or relocation of previously identified native Hawaiian burial sites is warranted, following criteria which shall include recognition that burial sites of high preservation value, such as areas with a concentration of skeletal remains, or prehistoric or historic burials associated with important individuals and events, or areas that are within a context of historic properties, or have known lineal descendants, shall receive greater consideration for preservation in place. The criteria shall be developed by the [DLNR] in consultation with the councils, office of Hawaiian affairs, representatives of development and large property owner interests, and appropriate Hawaiian organizations, such as Hui Malama I Na Kupuna O Hawai'i Nei, through rules adopted pursuant to chapter 91 . . . .

affect historic property ... or a burial site [.]" A burial site—"any specific unmarked location where prehistoric or historic human skeletal remains and their associated burial goods are interred"—can certainly be found in a cemetery. A cemetery can also fall within the definition of "historic property," which includes any structure, object, area, or site over fifty years old.

Kawaiahaʻo Church, however, relies on the phrase "not otherwise included in section 6E–41" in the definition of "burial site" to argue that cemeteries are exempt from the requirements of HRS § 6E–42. We disagree. HRS § 6E–41 does not encompass all cemeteries, but only cemeteries that are in the process of being redesignated or removed. When Kawaiahaʻo Church applied for government approval for the MPC Project, it was not in the process of redesignating or removing a cemetery. Instead, it was seeking approval for construction to replace a social hall and office building with a new building. During the approval process, neither Kawaiahaʻo Church nor the SHPD treated the MPC Project as being exempt from the historic preservation review process required by HRS § 6E–42. Indeed, the SHPD initially required the preparation of an AIS, and Kawaiahaʻo Church then sought to substitute an AMP for an AIS in the historic preservation review process after the project was scaled back.

Thus, when Kawaiahaʻo Church was seeking approval for the MPC Project—the time relevant for determining whether an AIS was required—the MPC Project was a project that "may affect ... a burial site" under HRS § 6E–42. Kawaiahaʻo Church and the SHPD both acknowledged that historic human burial sites were likely to be uncovered during the construction of the MPC Project.

In addition, the MPC Project was subject to the requirements of HRS § 6E–42 because it was a project that "may affect historic property." The MPC Project is in close proximity to Kawaiahaʻo Church,[16] which is listed on the National and Hawaiʻi registers of historic places, and the MPC Project affected a structure and site over fifty years old.

■ Hall acknowledges that HRS § 6E–43(a) excludes human skeletal remains found in "a known, maintained, actively used cemetery." We conclude that this exclusion does not apply to the MPC Project. The MPC Project included areas that clearly were not being maintained and actively used as a cemetery. The footprint of the MPC Project largely overlaps the footprint of Likeke Hall and the adjoining office building, which were constructed in 1940 and 1923, respectively. According to Kawaiahaʻo Church's archaeologist, the purpose of the disinterments of the 117 burials during the 1940 construction of Likeke Hall was to terminate any cemetery function in that area, and the main footprint of the MPC Project has been covered by cement and building foundations for over 60 years. Under the particular circumstances of this case—where the main footprint of the MPC Project had not been maintained and actively used as a cemetery for over 60 years and Kawaiahaʻo Church was not in the process of removing or redesignating the project site as a cemetery when government approvals for the MPC Project were sought—we conclude that the MPC Project and the burial sites it affected were subject to the requirements of HRS § 6E–42.[17]

V.

■ Having determined that Hall has standing to raise her HRS Chapter 6E claims and that the MPC Project was not

---

16. As discussed below, the parties dispute whether only the Kawaiahaʻo Church structure itself, as opposed to the Kawaiahaʻo Church grounds, is included in the National and Hawaiʻi registers of historic places. HRS § 6E–42, however, encompasses State approvals for project that "may affect" historic property. The MPC Project was a project that may affect historic property regardless of whether only the Kawaiahaʻo Church structure itself, or the entire Kawaiahaʻo Church grounds, is included in the National or Hawaiʻi registers.

17. Our decision is based on the particular circumstances of this case, and we are not required to determine the precise extent to which the requirements of HRS Chapter 6E apply to cemetery operations. We note, however, that the Legislature may wish to clarify its intent on this question.

exempt from the historic preservation review process required by HRS § 6E–42, we now turn to the question of whether an AIS was required for the MPC Project. While HRS § 6E–42 provides generally for a review and comment process, the details of this review process are governed by HAR Chapter 13–284, the DLNR rules that implement HRS § 6E–42. *Kaleikini*, 128 Hawai'i at 73, 283 P.3d at 80. We conclude that HAR Chapter 13–284 required the preparation of an AIS before the MPC Project was allowed to go forward.

The review and comment process established by HAR Chapter 13–284 provides in pertinent part as follows:

A State agency responsible for approving a project must identify and inventory historic properties that are present in the project area. HAR §§ 13–284–3(a), 13–284–5(a) (2003). To meet this obligation, the agency "shall first consult with the SHPD to determine if the area proposed for the project needs to undergo an inventory survey to determine if historic properties are present." HAR § 13–284–5(b). The SHPD, in turn, is required to respond in writing. *Id.* If the SHPD concludes that no significant historic sites are present or likely to be present due to past land disturbances or based on documentation submitted by the agency concerning the extent and depth of past land altering activities, then the SHPD shall make this determination in the form of a "no historic properties affected" letter. HAR § 13–284–5(b)(1), (2). If the SHPD responds that "an adequate survey exists and that historic properties are present, then the agency shall proceed to the next step of the review process, evaluation of the significance of the historic properties[.]" HAR § 13–284–5(b)(4). "If the SHPD concludes an inventory survey needs to be done, this survey shall identify all historic properties and gather enough information to evaluate the properties' significance." HAR § 13–284–5(b)(5).

The Hawai'i Supreme Court, in construing the "nearly identical" rules under HAR Chapter 13–275, stated in *Kaleikini* that the SHPD may respond to the agency's request for consultation in one of three ways:

(1) by determining that no historic properties are present; (2) by determining that "an adequate survey exists and that historic properties are present," which allows the agency to proceed to "the next step in the review process, [i.e.,] evaluation of the significance of the historic properties"; or (3) by concluding that an inventory survey needs to be done, which must "identify all historic properties and gather enough information to evaluate the properties' significance."

*Kaleikini*, 128 Hawai'i at 74, 283 P.3d at 81 (brackets in original). In this case, the SHPD did not make either of the first two determinations with respect to the MPC Project. Therefore, the completion of an AIS was a necessary first step.

The SHPD did not make the first determination described in *Kaleikini*. While the supreme court summarized this first determination as "no historic properties are present," the rules more specifically refer to this determination as no significant historic sites are present or likely to be present based on information regarding past land disturbances or land altering activities. HAR § 13–284–5(b)(1), (2). HRS § 6E–43(b) provides that "all burial sites are significant" and that areas with concentration of skeletal remains are of "high preservation value."

The record shows that the SHPD did not determine that no significant historic properties were present or likely to be present due to past land disturbances or land altering activities with respect to the MPC Project. In its initial evaluation of the MPC Project, the SHPD acknowledged the potential that the MPC Project would disturb historic burials based on "[h]istoric documentation suggest[ing] that significant subsurface historic deposits including human burials were once located in this area." Accordingly, the SHPD required an AIS to be conducted prior to any ground disturbance, and the Project Eligibility Permit, which the HCDA issued to Kawaiaha'o Church on February 24, 2004, was conditioned on the completion of an AIS. Similarly, the Development Permit and Certificate of Appropriateness issued by the HCDA on May 4, 2005, stated that the SHPD was "requiring [Kawaiaha'o Church]

to conduct an archaeological inventory survey with a program of subsurface testing to determine if historic sites are present." Even after the MPC Project was scaled back, the AMP submitted by Kawaiahaʻo Church stated: "It would seem likely however that some human remains would still lie under the footprint of the proposed construction." The AMP also stated: "The project area has the potential for historic cultural deposits relating to the early history of Kawaiahaʻo Church as well as both pre-contact and historic human burials.... Historic properties may be encountered anywhere within the project area."

The SHPD did not make the second determination described in *Kaleikini*. Defendants do not contend, and the record does not show, that the SHPD determined that "an adequate survey exists and that historic properties are present," which would permit proceeding to the evaluation of the significance of the historic properties—the next step in the review process.

Accordingly, the SHPD should have determined that an AIS "needs to be done," and the SHPD violated its own rules in failing to require an AIS before permitting the MPC Project to go forward. Instead of requiring an AIS, the SHPD determined that an AMP submitted by Kawaiahaʻo Church could be used as a substitute for an AIS, when it issued its "no adverse effect" letter based on the AMP. In doing so, the SHPD circumvented the sequential approach to the historic preservation review process and the requirements of the rules.

As the supreme court held in *Kaleikini*, the rules implementing the historic preservation review process establish a sequential process under which an AIS, where required, "forms part of the first step in this process" and must precede the SHPD's concurrence in a project. *Kaleikini*, 128 Hawaiʻi at 75, 283 P.3d at 82. "The goal of the review process is to identify significant historic properties in project areas, assess any effects, *and then* to develop and execute plans to avoid, minimize, or mitigate adverse effects to the significant historic properties in the public interest." HAR § 13–284–1(a) (2003) (emphasis added); *see Kaleikini*, 128 Hawaiʻi at 57, 283 P.3d at

64 (quoting parallel provision of HAR § 13–275–1(a)). The rules identify six sequential steps in the historic preservation review process:

(1) Identification and inventory, to determine if historic properties are present in the project's area and, if so, to identify and document (inventory) them;

(2) Evaluation of significance;

(3) Effect (impact) determination;

(4) Mitigation commitments which commit to acceptable forms of mitigation in order to properly handle or minimize impacts to significant properties;

(5) Detailed mitigation plan, scope of work to properly carry-out the general mitigation commitments; and

(6) Verification of completion of detailed mitigation plan.

HAR § 13–284–3(b).

■ Here, as in *Kaleikini*, the SHPD violated its rules by failing to require the completion of an AIS, part of the first sequential step, before continuing in the review process. This was a critical error because the preparation of an AIS was necessary for the SHPD to properly identify and evaluate the significance of the historic properties present in the MPC Project area and to determine the impact of the MPC Project on significant historic properties *before* considering mitigation plans. By treating the AMP as a substitute for an AIS, the SHPD skipped the critical first step and other required sequential steps in the review process. The rules do not permit the SHPD to accept a monitoring plan as a substitute for an AIS. Monitoring plans are directed at the mitigation step of the review process. *See* HRS § 6E–2 (defining "[m]itigation plan" to include monitoring plans). Indeed, the AMP submitted by Kawaiahaʻo Church described the proposed monitoring program as a "mitigation measure." One of the central purposes of the historic preservation law "is to require that the effects on historic properties be reviewed prior to the approval of a project." *Kaleikini*, 128 Hawaiʻi at 70, 283 P.3d at 77. By accepting the AMP as a substitute for an AIS, the SHPD skipped to the mitigation step of the review process and allowed con-

struction on the MPC Project to commence, without identifying the significant historic properties at issue and evaluating the impact of the MPC Project on them, thereby limiting the potential options for their protection and preservation.

■ Under HAR § 13–284–5, the SHPD can exercise discretion in determining whether an AIS is necessary because information regarding past land disturbances or land altering activities reveals that no significant historic sites are present or likely to be present, or because an adequate inventory survey already exists. However, the SHPD does not have discretion "to forego or delay an AIS when one is required" or "to opt-out of the sequential process outlined in the rules." *Kaleikini*, 128 Hawai'i at 76, 283 P.3d at 83. The SHPD's action in this case was akin to the City and State's reliance on the Programmatic Agreement as an "interim protection plan" in *Kaleikini*, which the supreme court held was impermissible. As the supreme court observed, "to permit mitigation commitments to be made prior to the properties at issue being identified" would "turn the process upside down." *Id.* at 77–78, 283 P.3d at 84–85 (brackets omitted).

## VI.

The Circuit Court granted summary judgment in favor of Defendants on all of Hall's claims arising out of HRS Chapter 6E (Counts 1, 2, 4, 5, 6, and 11) on the ground that they were "moot" based on the following reasoning: (1) Hall's HRS Chapter 6E claims were invalid if the MPC Project site was a cemetery because the protections provided by HRS Chapter 6E and HRS Chapter 441 are mutually exclusive; and (2) Hall was judicially estopped from denying that the MPC Project site was a cemetery because of actions taken by her attorney in the Kaleikini Lawsuit. We conclude that the Circuit Court erred in relying on this reasoning and in granting summary judgment in favor of Defendants on Hall's HRS Chapter 6E claims.

The Circuit Court erred in concluding that the protections provided by HRS Chapters 441 and 6E are mutually exclusive, and that only HRS Chapter 441 provides protection for human remains found in a cemetery.

The fact that HRS Chapter 441 imposes requirements for cemeteries does not mean that it would be illogical or inconsistent for HRS Chapter 6E to impose additional requirements relating to historic preservation on cemeteries. *See Chock v. Gov't Emps. Ins. Co.*, 103 Hawai'i 263, 269, 81 P.3d 1178, 1184 (2003) ("[W]here the statutes simply overlap in their application, *effect will be given to both if possible* [.]" (emphasis in original)). As we have previously explained, cemeteries are not exempt from the protections provided by HRS Chapter 6E, and the MPC Project was subject to the protections provided by HRS Chapter 6E.

In this case, the MPC Project site was subject to the protections of HRS Chapter 6E, regardless of whether the site was considered a cemetery. Accordingly, the Circuit Court erred in relying on judicial estoppel to grant summary judgment on Hall's HRS Chapter 6E claims.

## VII.

Based on the foregoing, we conclude that an AIS was required before the SHPD could concur in the MPC Project and that the SHPD violated its own rules in failing to require an AIS before permitting the project to go forward. *See Kaleikini*, 128 Hawai'i at 57, 283 P.3d at 64. We vacate the Circuit Court's judgment in favor of Defendants on Hall's claims arising under HRS Chapter 6E (Counts 1, 2, 4, 5, 6, and 11).

## VIII.

We now address the Circuit Court's grant of summary judgment in favor of Defendants on the non-HRS Chapter 6E counts.

### A.

With respect to Count 3, Hall alleged that the use of a blanket disinterment permit under HRS § 338–25.5(a) (2010), without any rules for the issuance of disinterment permits, to disinter and relocate native Hawaiian historic burials violated her due process rights. Hall's due process claim in Count 3 was premised on the assumption that the MPC Project would not be subject to the

requirements of HRS § 6E–42 and that an AIS would not be required. However, we have concluded that the MPC Project is subject to the requirements of HRS § 6E–42 and that the State erred in not requiring the preparation of an AIS.

The Circuit Court ruled that Hall lacked standing regarding Court 3 because HRS Chapter 338 did not create a private right of action. However, as previously noted, Hall has standing under HRS § 6E–13 to raise claims to protect historic native Hawaiian burials affected by the MPC Project. Moreover, Hall was not seeking enforcement of any provision in HRS Chapter 338, but was claiming a violation of her due process rights, and thus her due process claim did not turn on whether HRS Chapter 338 provided a private right of action. Therefore, the Circuit Court's reason for granting summary judgment on Count 3 was erroneous.

We vacate the dismissal of Count 3. Based on our ruling that the MPC Project is subject to HRS § 6E–42 and that the preparation of an AIS was required prior to the SHPD's concurrence in the MPC Project, the resolution of Count 3 is premature. The application of HRS § 6E–42 to the MPC Project may satisfy any due process requirements and/or render the relief sought in Count 3 unnecessary or redundant of claims made in other counts. *See Rees v. Carlisle*, 113 Hawai'i 446, 456, 153 P.3d 1131, 1141 (2007) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (internal quotation marks and citation omitted)). Accordingly, we remand the case to permit reconsideration of Count 3 based on a more fully developed record.

### B.

■ With respect to Count 7, Hall alleged that the preparation of an environmental assessment (EA) was required pursuant to HRS §§ 343–5(a)(4) and 343–5(c) (2010), which provided, in relevant part:

(a) Except as otherwise provided, an environmental assessment shall be required for actions that:

. . . .

(4) Propose any use within any historic site as designated in the National Register or Hawaii Register, as provided for in the Historic Preservation Act of 1966, Public Law 89–665, or chapter 6E.

. . . .

(c) Whenever an applicant proposes an action specified by subsection (a) that requires approval of an agency and that is not a specific type of action declared exempt under section 343–6, the agency initially receiving and agreeing to process the request for approval shall prepare an environmental assessment of the proposed action at the earliest practicable time to determine whether an environmental impact statement shall be required. . . . [18]

Hall alleged that the entire Kawaiaha'o Church property is a historic site on "the National and Hawaii Register"; that the proposed use of the Kawaiaha'o Church property for the MPC Project triggered the requirement for an EA under HRS § 343–5(a)(4); that the DLNR's June 11, 2009, letter authorizing disinterment of burials and the DOH's October 22, 2010, letter approving a blanket disinterment permit constituted discretionary permits or approvals; that no determination that the MPC Project was exempt from an EA had been made; and therefore, permits and approvals for the MPC Project, including the DOH's disinterment permit, could not be issued until an EA was prepared. Hall asserted that because no EA had been prepared, the State's authorization to disinter burials must be revoked.

In granting summary judgment in favor of Defendants, the Circuit Court found that only the Kawaiaha'o Church structure itself, and not the surrounding grounds where the MPC Project site was located, was designated in the National and Hawai'i registers of historic places. The Circuit Court therefore concluded that the need for an EA was not

---

**18.** Recent amendments to HRS § 343–5 provide that the agency shall "require the applicant" to prepare the EA. 2012 Haw. Sess. Laws Act 312, § 2 at 1048; 2012 Haw. Sess. Laws Act 172, § 2 at 606.

triggered by HRS § 343–5(a)(4). The parties disputed the issue of the scope and extent of Kawaiaha'o Church's property that was designated in the National and Hawai'i registers. Conflicting evidence was presented to the Circuit Court on this issue, and no evidence was presented from anyone responsible for maintaining the National or Hawai'i registers. The Circuit Court resolved the conflicting evidence by finding that only the Kawaiaha'o Church structure itself, and not the MPC Project site, was included in the National and Hawai'i registers.[19] We conclude that the Circuit Court erred in granting summary judgment on this basis because there were genuine issues of material fact regarding whether the MPC Project site was included in the National and Hawai'i registers. *See* Hawai'i Rules of Civil Procedure Rule 56(c) (2000). Accordingly, we vacate the Circuit Court's dismissal of Count 7 and remand for further proceedings.[20]

## C.

With respect to Count 8, Hall alleged that Defendants failed to obtain required permits and approvals for the MPC Project and the

disinterment of burials, and she sought attorney's fees and costs pursuant to HRS § 607–25(e)(1) (Supp.2011).[21] HRS § 607–25(e)(1) only applies to civil actions for injunctive relief between private parties and does not authorize any relief against the State. We therefore affirm the dismissal of Count 8 against the State Defendants.

In granting summary judgment in favor of Kawaiaha'o Church on Count 8, the Circuit Court relied on its analysis that HRS Chapter 6E did not apply to the MPC Project. Based on this analysis, the Circuit Court concluded that the required permits had been obtained and that Count 8 was moot. Because the Circuit Court's decision was based on its erroneous analysis regarding the inapplicability of HRS Chapter 6E, we vacate its dismissal of Count 8 against Kawaiaha'o Church.

## D.

In Count 9, Hall alleged that Defendants failed to fulfill the obligations imposed on them by the public trust doctrine in consider-

---

**19.** Hall introduced as exhibits the AMP prepared by Kawaiaha'o Church's consultant and the Final Supplemental Environmental Impact Statement for the Kaka'ako Community Development District, which both referred to Kawaiaha'o Church *and its grounds* as being on the National and/or Hawai'i register. In support of its finding, the Circuit Court noted that the nomination forms submitted to the National Register of Historic Places for "Kawaiaha'o Church and Mission Houses" and the "Hawaii Capital Historic District" (which included Kawaiaha'o Church) checked the "building" rather than the "site" category in the category classification. However, no evidence was presented regarding the significance of this marking or whether the building classification excluded the surrounding grounds. In addition, the section on geographical data in the nomination form for "Kawaiaha'o Church and Mission Houses" describes the acreage of the nominated property as 8.8 acres and contains a boundary description that appears to include the grounds of Kawaiaha'o Church and the MPC Project site. The nomination form for the "Hawaii Capital Historic District" refers to "Kawaiahao Church/grounds" in the section describing the nominated property.

**20.** We note that in its motion for summary judgment, Kawaiaha'o Church argued that Count 7 was barred by the statute of limitations set forth in HRS § 343–7(a) (2010), which provides that

judicial proceedings based on the lack of an EA required by HRS § 343–5 "shall be initiated within one hundred twenty days of the agency's decision to carry out or approve the action, or, if a proposed action is undertaken without a formal determination by the agency that a statement is or is not required, a judicial proceeding shall be instituted within one hundred twenty days after the proposed action is started." Kawaiaha'o Church argued that the statute of limitation began to run at the latest when construction began on the MPC Project in November 2007. Hall, on the other hand, argued that the statute of limitations did not begin to run until the DOH issued its letter approving a blanket disinterment permit on October 22, 2010. The Circuit Court did not address the parties' statute of limitations arguments in ruling on Defendants' motions for summary judgment, and it may address the statute of limitations issue on remand.

**21.** HRS § 607–25(e)(1) provides:

> (e) In any civil action in this State where a private party sues for injunctive relief against another private party who has been or is undertaking any development without obtaining all permits or approvals required by law from government agencies:
> (1) The court may award reasonable attorney's fees and costs of the suit to the prevailing party.

ing Kawaiahaʻo Church's development proposal. Hawaiʻi's public trust doctrine is embodied in Article XI, Section 1 of the Hawaiʻi Constitution, which provides:

> For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaiʻi's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.

> All public natural resources are held in trust by the State for the benefit of the people.

*See Morgan v. Planning Dept., County of Kauai,* 104 Hawaiʻi 173, 184 n. 12, 86 P.3d 982, 993 n. 12 (2004); *In re Water Use Permit Applications,* 94 Hawaiʻi 97, 131–32, 9 P.3d 409, 443–44 (2000) (hereinafter, *"Waiahole I"*). The public trust doctrine is also embodied in Article XI, Section 7 of the Hawaiʻi Constitution, which pertains to the State's water resources, and provides, in relevant part, that "[t]he State has an obligation to protect, control and regulate the use of Hawaii's water resources for the benefit of its people." *See Waiahole I,* 94 Hawaiʻi at 131, 9 P.3d at 443. In *Waiahole I,* the Hawaiʻi Supreme Court held that "article XI, section 1 and article XI, section 7 adopt the public trust doctrine as a fundamental principle of constitutional law in Hawaiʻi." *Id.* at 131–32, 9 P.3d at 443–44.

The Circuit Court ruled that the public trust doctrine did not apply in this case. Hall does not cite any authority which supports the application of the public trust doctrine, as set forth in Article XI, Section 1 of the Hawaiʻi Constitution, to Kawaiahaʻo Church or the State Defendants under the circumstances of this case. We therefore affirm the Circuit Court's grant of summary judgment on Count 9 in favor of Defendants.

## E.

In Count 10, Hall alleged that Defendants failed to investigate and protect native Hawaiian rights. Hall does not challenge the Circuit Court's grant of summary judgment

in favor of Kawaiahaʻo Church on Count 10, and we therefore affirm the Circuit Court's dismissal of Count 10 against Kawaiahaʻo Church. See Hawaiʻi Rules of Appellate Procedure Rule 28(b)(7) (2010) ("Points not argued may be deemed waived.").

With respect to the State Defendants, Hall argues that Count 10 is based on Article XII, Section 7 of the Hawaiʻi Constitution, which provides:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupuaʻa tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

In granting summary judgment in favor of the State Defendants on Count 10, the Circuit Court ruled that the State Defendants did not violate article XII, section 7.

We have already concluded that the MPC Project was subject to the requirements of HRS § 6E–42 and its implementing rules. Hall does not contend that the protection provided by HRS § 6E–42 and its implementing rules is insufficient or violates article XII, section 7. Under the circumstances of this case, we conclude that Hall has failed to cite any persuasive authority that article XII, section 7 provides an independent cause of action establishing a basis for relief against the State Defendants that is separate from her HRS Chapter 6E claims. *See State v. Hanapi,* 89 Hawaiʻi 177, 186–87, 970 P.2d 485, 494–95 (1998) (concluding that Article XII, Section 7 of the Hawaiʻi Constitution does not authorize the exercise of traditional and customary native Hawaiian rights on fully developed property). Accordingly, we affirm the Circuit Court's grant of summary judgment in favor of the State Defendants on Count 10.

## IX.

We decline Hall's request that we enter summary judgment in her favor on the claims raised in her second amended complaint. With respect to the counts dismissed by the Circuit Court that we have vacated, including Hall's HRS Chapter 6E claims, Hall "sought a wide range of relief in the

[C]ircuit [C]ourt, and the rationale for granting or denying that relief has not been fully developed." *See Kaleikini,* 128 Hawai'i at 81, 283 P.3d at 88. The factual circumstances of this case continue to evolve, and additional information and developments, such as information obtained through the performance of an AIS and actions taken in reliance on the injunction obtained in the Kaleikini Lawsuit, may be relevant to the proper determination of this case. It is not clear what impact such additional facts or developments may have on the relief Hall seeks. Accordingly, we decline Hall's invitation to enter judgment in her favor on any of the counts dismissed by the Circuit Court that we have vacated. *See id.*

## CONCLUSION

We affirm the Circuit Court's final judgment with respect to the entry of judgment in favor of the State Defendants on Count 8 and in favor of the State Defendants and Kawaiaha'o Church on Counts 9 and 10. We vacate the final judgment with respect to the entry of judgment in favor of the State Defendants and Kawaiaha'o Church on all other counts (Counts 1, 2, 3, 4, 5, 6, 7, 8 (as to Kawaiaha'o Church), and 11), and we remand the case for further proceedings consistent with this Opinion.